**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**William Byron LANGLEY, Defendant-Appellant.**

**No. 71-1959.**

United States Court of Appeals,
Sixth Circuit.

Aug. 29, 1972.

28

Edward D. Devine, Jr. (Court Appointed), Detroit, Mich., for defendant-appellant.

James Russell, Asst. U. S. Atty., Detroit, Mich., Ralph B. Guy, U. S. Atty., Terence V. Page, Harold Hood, Asst. U. S. Attys., on brief, for plaintiff-appellee.

Before PHILLIPS, Chief Judge, MILLER, Circuit Judge, and O'SULLIVAN, Senior Circuit Judge.

WILLIAM E. MILLER, Circuit Judge.

This is a direct appeal from the conviction of William B. Langley for having possessed chattels which he knew to have been stolen from an interstate shipment in violation of 18 U.S.C. § 659.[1] Appellant advances two issues on

1. 18 U.S.C. § 659 provides ·in pertinent part:

Whoever embezzles, steals, or unlawfully takes, carries away, or conceals, or by fraud or deception obtains from any railroad car, wagon, motortruck, or other vehicle, or from any station, station house, platform or depot or from any steamboat, vessel, or wharf, or from any aircraft, air terminal, airport, aircraft terminal or air navigation facility with intent to convert to his own use any

appeal, asserting that the district court erred in denying his motion to suppress evidence seized from his dwelling, and that the prosecution failed to establish the interstate nature of the allegedly stolen goods.[2]

The following facts were adduced at trial and at the hearing on appellant's motion to suppress. Appellant does not challenge the facts relied upon by the Government as such but rather the legal conclusions and factual inferences drawn therefrom.

At approximately 3:30 A.M. on the morning of November 19, 1970, the police of Madison Heights, Michigan, received a call from a woman who reported that a large Avis Rental truck was parked in the driveway of a nearby house, 26574 Park Court, and that she believed a burglary to be in progress. At 4:10 A.M. a patrol car was dispatched to the premises.[3] Upon arrival, the policemen got out of their car; Officer Petit proceeded to the rear of the dwelling and his partner to the front. As reported, the Avis truck was parked in the driveway. Additionally, it was seen that "the windows of the house were all taped with newspaper and tape and the drapes pulled tightly shut." "Banging on the door" brought no response from within the house.

Officer Petit testified that, walking back from the rear of the house, he noticed that the vertically sliding door of the truck was open "approximately a foot, foot and a half." He further "observed . . . what appeared to be large packing crates on this truck." He testified that he "figured someone could be in this truck hiding." In order to investigate this suspicion he "pushed the door open the rest of the way, entered this vehicle to check for any occupants. . . ." Finding no one, Petit observed more closely the "five large packing crates" which were loaded near the rear of the truck. He made note of the markings on the sides of the boxes, testifying: "I took down all the numbers off the different boxes, on my pad, and I climbed out of the back of the vehicle."[4]

goods or chattels moving as or which are a part of or which constitute an interstate or foreign shipment of freight or express; or

Whoever buys or receives or has in his possession any such goods or chattels, knowing the same to have been embezzled or stolen.; . . . .

2. At the hearing on the motion to suppress, appellant also challenged his arrest on the ground that the arresting officer did not have probable cause. On appeal, appellant does not challenge his arrest nor the seizure of evidence pursuant thereto. While we do not discuss this issue, we have considered the question and are of the opinion that the recitation of facts that follows amply reveals that Officer Petit had probable cause to arrest Langley.

3. One of the two policemen dispatched, Officer Max Michael Petit, testified at the suppression hearing and at trial regarding the early morning investigation and the arrest of Langley.

4. The following colloquy occurred at trial regarding Officer Petit's observations while in the Avis truck and his identification of evidence pertaining to the truck and crates.

Let me show you Government Exhibit No. 1 and ask you if you recognize it.
A. Yes, sir, I do.
Q. And what is it a picture of?
A. It is a picture of one of the packaging crates that was in the back of this vehicle, in the driveway at 26574 Park Court, Madison Heights.
Q. I see. How far—when you observed these packing crates in the back of the vehicle, how far from the rear of the truck was the outermost crate located?
A. I would say less than a foot.
Q. Less than a foot.
Patrolman Petit, can you detect from that picture the markings which you observed personally on those crates?
A. Yes, sir, I can.
Q. And what did the markings indicate to you?
A. They indicated that these are from P & D Manufacturing Company. And they are to Autolite—Ford Parts Division, Dallas Parts Depot, Ford Marketing Corporation, 2405 Beltline Road, in Carrollton, Texas.

His immediate suspicions allayed, Petit proceeded to the front of the house where he found another officer[5] conversing with one of the neighbors. Petit listened to the conversation momentarily and then "went back to knock on the house to try to get some response." His subsequent observations were described thusly:

At this time, one window that would be on the northwest side of the home—the drapes on all the windows were taped up with newspaper or the drapes were heavily pulled—on one window the drapes had slightly parted down at the bottom I would say maybe an inch. I peered into this to try to see into the house. I saw a figure dart from the living room, towards the kitchen, which would be from the north—that would be from the west to the east, I believe.

Q. Are you able to detect from that marking where P & D Manufacturing Corporation is located?

A. Not from this photograph, no.

Q. Were you able to observe it upon your personal observation?

A. Yes, sir; it was in New York.

Mr. Page: Your Honor, I would like to show this exhibit to the jury.

The Court: Very well.

Q. (By Mr. Page, continuing): Patrolman Petit, outside of the markings that you testified you saw on those packing crates, were there any other markings, any other numbers?

A. There were other numbers, parts numbers on the crates.

Also, one of these crates was torn open and there were a number of smaller boxes and parts inside this crate.

Q. Do you recall what that part number was?

A. No, I do not recall the full number.

Q. Do you recognize it from Government Exhibit 1?

A. Yes, sir, I do.

Q. What part number is that?

A. B8Q–12171–A.

Q. I will show you Goverment's Proposed Exhibit No. 2 and ask you if you recognize it.

A. Yes, sir; this is a vehicle like the one at this address of 26574 Park Court, Madison Heights.

And at the same time, I also observed a box sitting on the dresser, that was open. This box and so forth was very similar, the same as what I found in the truck in these large packing crates.

He returned to the back of the house to knock. Again there was no response from within. Petit went back to the window through which he had observed the crouched figure and, seeing no one, checked out the front of the house where "there were no signs of forcible entry."

At this point the police decided to "clear the scene" but continue to "watch the house." As the two police cars departed, a later model Ford arrived, stopping one house north of the house under investigation. Lieutenant Badgley conferred with its driver, who indicated that he did not live in the house, did not know its occupant, and, in fact, "didn't belong in the neighborhood."

Q. And Government Exhibit No. 3.

A. Yes, sir; that is the vehicle that was in the driveway at 26574 Park Court.

Q. And this Government Exhibit 4.

A. Yes, sir; that is also the same vehicle that was in the driveway at 26574 Park Court.

Q. It is not clear from the picture. How many packing crates were in that truck?

A. There were five packing crates.

Q. Did you have occasion to examine the contents of any of those packing crates?

A. Yes, sir; one crate was open, torn open, on the top. Inside, I could see numerous smaller packages. And one of these packages was also open. And inside there was what appeared to be point sets for an automobile.

Q. Do you know how many point sets were in these five packing crates?

A. From the estimate of the number on the crates, my own estimate, there was approximately 40,000.

Q. What did you do after examining the crates?

A. I took down all the numbers off the different boxes, on my pad, and I climbed out of the back of the vehicle.

5. By this time another patrol car had arrived. A Lieutenant Badgley who was in the second patrol car was interviewing the neighbor.

As the police cars drove off, Petit observed a party get out of the Ford. In order "to observe where this party was going" he circled the block. He saw the party disappear into the house, reappear, and begin work on the truck for a moment. Almost immediately he observed the truck pull out of the driveway and proceed down the street. He followed. When the truck exceeded the speed limit, Petit, "using the flashers and the siren of the police vehicle . . . pulled him over." The truck finally stopped; Petit proceeded to the driver's side and "requested the driver's license and registration for the vehicle of the driver." The driver produced his license but no registration. Petit asked for a "rental receipt or something" that would demonstrate that the driver had rightful possession of the vehicle. None was produced. Petit "asked him if he had anything in the way of a bill of sale or shipping orders for the equipment in the back of the vehicle." According to Petit, "he [the driver] stated to me that there was nothing in the back of the vehicle. He said the vehicle was empty and he was going to haul potatoes." Petit advised the party that he "would have to take him into the station for investigation of possession of this truck," placing him in effect under arrest.[6]

Subsequent to Langley's arrest, a search warrant was issued authorizing search of the house in question, a one-story brick and frame residence, and adjacent two-car garage situated at 26574 Park Court, Madison Heights, Michigan. Prior to the application for this warrant, Petit had been apprised by Agent Lewis Vernazza of the FBI that a shipment of Autolite Automobile Electrical Points had been stolen.[7] Based on the information supplied by Agent Vernazza, the information obtained during investigation of the suspected burglary at 26574 Park Court, and finally on the conduct of Langley at the time of his arrest, an affidavit was filed by Officer Petit in support of his application to search Langley's dwelling. The affida-

6. The following dialogue reflects Petit's representations as to his perceptions at this point:

When you arrived at the premises that you were told by radio to investigate, did you believe any type of crime to having been made or in the process of being made?

A. Yes, sir; I believed that this vehicle was involved in possibly unloading the furnishings from this home, putting them in the back of the truck to carry them away.

Q. What kind of offense is that?

A. That would be breaking and entering. It would be a felony.

Q. Now, when you pulled the truck over, then, subsequently, did you still believe that this individual was involved in any type of violation of law?

A. Yes, sir, I did. I believe that he was in the process of something at this home, either a breakin or stealing, a larceny, from this home.

Q. When you pulled the truck over, Officer Petit, was it your intention to arrest the individual involved regardless of what was said by this individual to you upon investigation?

A. No, sir. At that time, I didn't have any real sufficient grounds to arrest this party.

Q. On what basis was he arrested?

A. He was arrested on the basis that he did not have ownership of this vehicle or shipping orders or ownership of the parts in the back of this vehicle.

7. In the affidavit filed in support of the application for a search warrant Officer Petit stated:

At this time it was reported to your affiant by Special Agent Louis Vernazza, F.B.I., Detroit, that Mr. Frank Gamaro, President, P & D Manufacturing Company, Long Island City, New York, had been reached by telephone and reported that 40,000 Autolite Automobile Electrical Points had been stolen from a derailed box car in Allentown, Pennsylvania on November 14, 1970. These electrical points were being shipped by rail from P & D Manufacturing Company to Autolite, Ford Parts Division, Dallas Parts Depot, Ford Marketing Corporation, 2405 Belt Line Road, Carrolton, Texas under invoice number B8Q12171A. Mr. Gamaro advised that this number was stenciled on all shipping crates of this order.

vit described briefly the circumstances which led the police to investigate the house which Langley rented from his neighbor. Of special note is the statement:

> C) Your affiant observed a large Avis rent-a-truck bearing 1970 Michigan license 2976CB with the rear sliding door open parked in the driveway of the said address. Inside the storage area were five large packing cartons with Autolite, Ford Parts Division, Dallas Parts Depot, Ford Marketing Corporation, 2405 Belt Line Road, Carrollton, Texas, stenciled on the carton closest to the door opening. The other four boxes all appeared to be identical in size and markings.

The affidavit set forth Petit's observations through the parted drapery: the crouched figure and "an open carton with the same size and color as the cartons which were found inside of the five large packing crates in the . . . truck." Further, the affidavit set forth the above-noted information supplied by FBI Agent Vernazza and concluded by describing Langley's arrival at the premises in question and his subsequent arrest.

Upon execution of the search warrant, Officer Petit located one carton of Autolite points on the dresser in the bedroom on the southwest side of the house. This carton was confiscated and subsequently introduced in evidence at trial.

On December 2, 1970, Langley was indicted for the offense of possessing chattels stolen from an interstate shipment. On May 3, 1971, appellant filed a motion to suppress and dismiss the indictment challenging both his arrest and the search of his dwelling. On May 12, 1971, an evidentiary hearing was held on the motion to suppress. Appellant's motion to suppress the evidence which had been seized was denied and trial before a jury commenced on May 18, 1971.

On May 19, 1971, the jury returned a verdict of guilty. Appellant was committed to the custody of the Attorney General for a period of three years. From the judgment below appeal is taken.

## I

Appellant contends that the Government did not introduce sufficient evidence that the Autolite points were stolen from a shipment moving in interstate commerce. Essentially, appellant's argument, as we understand it, advances the contention that the Government failed to establish beyond a reasonable doubt that the evidence found in appellant's possession and introduced at trial was identical to the Autolite points whose history as goods shipped in interstate commerce was established by documents introduced at trial and from testimony of those involved in the transportation of the goods described in the documentary evidence.

Our role as a reviewing court is, of course, well established. It is not for this Court to "weigh the evidence" nor "to determine the credibility of witnesses." Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). That a verdict may be based on circumstantial evidence does not alter the standard of review. A jury is permitted to draw reasonable inferences in arriving at a verdict of guilty. That other inferences might have been drawn does not mandate reversal. It is not the function of the court of appeals to substitute its judgment for that of the jury in the evaluation of circumstantial evidence.

It is our view that the Government introduced sufficient evidence from which the jury might infer that the Autolite points found in Langley's possession were stolen from an interstate shipment. Photographs of the Avis truck showing crates of points clearly visible, the crates and cartons of points introduced at trial and Officer Petit's oral testimony, established appellant's possession of approximately 40,000 Autolite points which were boxed in cartons packaged in five crates, which bore the addresses of the Long Island, New

York consignor and the Carrollton, Texas consignee, as well as the reference number B8Q1217A, DP–12. Three invoices supported by oral testimony established that 40,000 Autolite point sets, bearing a reference number B8Q1217A, DP–12, were shipped to Autolite Ford Parts Division, Dallas Parts Depot, Ford Marketing Corp., 2405 Belt Line Road, Carrollton, Texas, by the P. & D. Manufacturing Company. It was further established that these goods never reached their destination.

Challenging the sufficiency of the Government's proof, appellant focuses upon the failure of the Government to demonstrate directly that the parts in appellant's possession were the same points that were described in the invoices. He points out, for example, that the reference number B8Q1217A was a general one referring to the kind of goods and not any specific shipment. In consequence, it is argued that the identifying number did not necessarily refer to the goods found in Langley's possession. The district court responded to this contention in the following fashion:

> But I think that there can be drawn a reasonable inference that when we have a description that matches exactly as to number, type and packaging, and the proximity in time involved, then I think that the Government has established enough of a case to go to the jury.
>
> I think, without question, that the Court must make reasonable inferences. And when we have these similarities and coincidences, it is hardly enough to explain.
>
> It think that I would agree with Mr. Stoorman if these were loose parts or in smaller cartons or something of that sort.

The coincidence of time, the number of points and mode of packing, constitute adequate proof upon which a jury might reasonably infer that the points in Langley's possession were stolen from an interstate shipment.

## II

We turn to the validity of the warrant authorizing the search of appellant's rented dwelling. Challenging the warrant, the appellant focuses upon the initial police investigation of the reported burglary. He asserts that information which formed a crucial portion of the affidavit was the fruit of illegal searches. Because the investigation of the reported burglary did provide information which was critical in the affidavit supporting the application for a warrant, the validity of the warrant turns in part upon the legitimacy of the conduct which produced that information.

At the outset, it must be acknowledged that the police investigation of the reported burglary at 26574 Park Court did constitute a "search" and must therefore be subjected to scrutiny under the Fourth Amendment. The police did go onto the immediate premises of Langley's dwelling. Further, Officer Petit stated at the suppression hearing, at trial and in his affidavit supporting the application for a warrant, that he entered the back of the Avis truck and that he looked through the window of the dwelling. Such acts constitute invasions of "privacy." [8]

Of warrantless searches, Mr. Justice Stewart in Coolidge v. New Hampshire, 403 U.S. 443, 454, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971) stated:

> Thus the most basic constitutional rule in this area is that "searches conducted outside the judicial process without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." The exceptions are "jealously and carefully drawn," and there must be "a showing by those who seek exemption . . . that the exigencies of the situation made that course imperative." "[T]he burden is on those seeking the exemption to show the need for it." (Footnotes omitted.)

8. See United States v. Nelson, 459 F.2d 884 (6th Cir. 1972) (concurring opinion).

Warrantless searches have been held to be "reasonable" in various circumstances.[9] Such a search must pass a highly restrictive two-pronged test of reasonability. A heavy burden must be borne by the Government in demonstrating the need for an exception to the warrant requirement. United States v. Jeffers, 342 U.S. 48, 51, 72 S. Ct. 93, 96 L.Ed. 59 (1951). First, the Court must determine the presence of circumstances sufficiently exigent to warrant disregard of the Fourth Amendment's ban against invasions of privacy. Second, and equally important, the court must examine with care the manner and scope of the search that was conducted in response to the purportedly "exigent circumstances." Terry v. Ohio, 392 U.S. 1, 28, 29, 88 S.Ct. 1868, 1881, 20 L.Ed.2d 889 (1968). In *Terry*, the Court made clear that "[t]he manner in which the seizure and search were conducted is . . . as vital a part of the inquiry as whether they were warranted at all" and that "evidence may not be introduced if it was discovered by means of a seizure and search which were not reasonably related in scope to the justification for their initiation."[10] Applying this test to the case before us, we find that, with one exception, the action taken by Officer Petit and his colleagues investigating the purported burglary at the Langley dwelling was reasonable under the circumstances.

The police were dispatched to the Langley residence in response to a report that a burglary was in process. At that time of the morning it was still dark. The police were told that an Avis truck was parked in the driveway. Upon arrival, they found the truck there and further discovered that the windows of the house were covered either by drapery or paper taped upon them. There is no suggestion in the record that Officer Petit and those with him acted out of any motive other than the suspicion that a burglary was in process. We think that such circumstances not only warrant but mandate police action which may involve limited intrusions of the "privacy" of the premises. Here the intrusions upon the Langley premises were geared to protect the privacy and security of the premises; they were directed not at Langley or other occupants of the house but rather at suspected burglars.

Thus, we find that the police acted reasonably in going upon the premises immediately surrounding the dwelling at 26574 Park Court. Further, we find that the circumstances justified Officer Petit's looking into the house through the window and in looking into the Avis truck which was parked in the driveway. Such acts are limited in scope and we think analogous to the "frisk" sanctioned in Terry v. Ohio, *supra*. However, it is our view that Officer Petit did go a step beyond that which was sanctioned by the circumstances by entering the Avis truck and copying down the markings and numerals on the boxes. As Petit described the situation, the presence of an intruder might have been easily ascertained by means other than entering the truck. And certainly, while Petit could not help noticing the markings on the box and recall them in a general way, it cannot plausibly be contended that such careful scrutiny of the boxes was warranted.

We have set forth above the information which was contained in the affidavit which Langley challenges on this appeal. Because we find that the limited intrusions upon the Langley premises were "reasonable" in light of the circumstances, excepting the entry of the truck, all of the information contained in the affidavit must be said to

---

9. *See, e. g.*, Harris v. United States, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968) ; Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) ; and Downing v. Kunzig, 454 F. 2d 1230 (6th Cir. 1972).

10. *See* Warden v. Hayden, supra n. 9, at 310 (Mr. Justice Fortas concurring).

have been legally obtained other than the detailed references to the markings on the boxes. It must be emphasized that where such tainted information comprises more than a *very minor portion* of that found in an affidavit supporting a warrant to search, the warrant must be held invalid. Here the details provided by Petit's entry into the truck were not significant. The other information contained in the affidavit and set forth above certainly constituted probable cause to search Langley's dwelling. Accordingly, the district court did not err in denying Langley's motion to suppress the carton of Autolite points seized from the house.

It is our view that appellant's contentions are without merit and that the judgment of the district court should be and it is hereby affirmed.